UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------X
CONSOLIDATED EDISON COMPANY OF
NEW YORK, INC.,

        Plaintiff,

   -against-

FYN PAINT & LACQUER CO., INC.,
WILLIAM FEINSTEIN and KENT RIVER
CORP.,

        Defendants.

--------------------------------X

<u>MEMORANDUM AND ORDER</u>

Civil Action No.
CV-00-3764 (DGT)

Trager, J:

     Pursuant to the instructions of the court, defendants Fyn
Paint & Lacquer Co., Inc. ("Fyn Paint"), William Feinstein
("Feinstein") and Kent River Corp. ("Kent River") (collectively
"defendants") submitted a proposed judgment on October 18, 2007
to implement the settlement agreement defendants reached with
plaintiff Consolidated Edison Company of New York, Inc.
("plaintiff" or "Con Edison") at the parties' May 7, 2003
settlement conference.  In response to the proposed judgment, Con
Edison filed an opposition brief on November 2, 2007 claiming
(1) that the settlement agreement included certain conditions
precedent that had not been satisfied, (2) that defendants had
breached the settlement agreement rendering it unenforceable
against Con Edison, and (3) that Con Edison had not assented to

1

the proposed form of judgment.

For the reasons explained below, the May 7, 2003 settlement agreement (the "agreement") remains enforceable. The proposed judgment will be entered as a settlement judgment, with some minor modifications to ensure that the judgment appropriately implements the agreement reached between the parties.

## Background

This case involves a long-standing dispute over the environmental cleanup of two adjacent properties in Brooklyn. Con Edison filed a complaint against defendants Fyn Paint and Feinstein on June 26, 2000, alleging that contaminants released from the Fyn Paint manufacturing facility at 230 Kent Avenue, Brooklyn New York (the "Fyn Paint site") had contaminated the neighboring property owned by Con Edison at 214 Kent Avenue, Brooklyn, New York (the "Con Edison site").[1]

The parties have been engaged in settlement discussions since the initiation of this lawsuit. Initial settlement conferences, as well as pre-trial discovery, were overseen by Magistrate Judge Go. On February 12, 2002, the parties informed Judge Go that they had reached a settlement and were drafting a

---

[1] Feinstein owns a 64% interest in Fyn Paint, which is a closely-held corporation. He also owns a 50% interest in Kent River, which is the actual owner of the Fyn Paint site. Kent River's only reported asset at this time is the Fyn Paint site.

stipulated agreement for her approval.  Letter from Lawrence
Menkes to Magistrate Judge Go (Feb. 12, 2002).  This purported
settlement, however, shortly fell apart because no real meeting
of the minds occurred.  The parties instead prepared a Pre-Trial
Order and took steps to place this matter on the calendar for
trial.

After some pre-trial preparations, the parties resumed
settlement discussions in coordination with the court.  On
October 3, 2002, defendants submitted a confidential letter to
Con Edison and the court outlining a proposed settlement that the
parties had discussed at an October 2, 2002 status conference.
Letter from Nicholas Ward-Willis to Judge Trager (Oct. 3, 2002).
Defendants proposed to pay an initial $225,000 toward the cost of
remediation.  The proposal anticipated that Con Edison would also
pay up to $225,000 of remediation costs, with Con Edison's share
decreasing if the cleanup cost less than $800,000.  Defendants
also asked Con Edison to file an Amended Complaint naming Kent
River as a defendant, in order to reach Kent River insurance
policies that could help pay for remediation costs.  Finally,
defendants offered Con Edison the option of accepting any
proceeds recovered through defendants' insurance actions, or
instead taking ownership of the Fyn Paint property in lieu of
additional remediation payments.

Con Edison quickly rejected defendants' offer as "grossly

inadequate." Letter from Lawrence Menkes to Judge Trager (Oct. 4, 2002) at 3. In particular, Con Edison rejected defendants' offer of "either highly speculative insurance proceeds or title to a badly contaminated piece of property" as partial payment for defendants' share of the expected cleanup. Con Edison, however, did file the requested Second Amended Complaint on October 17, 2002 to add Kent River as a defendant, so that defendants could reach the Kent River insurance policies.

The parties continued to negotiate toward a settlement. These talks culminated in a May 7, 2003 status conference (the "May 2003 conference") in which the parties committed, on the record and before the court, to a settlement agreement. Under the agreement, defendants would contribute up to $792,000, representing 72% of the cost for investigation and remediation of the Fyn Paint and Con Edison properties up to a limit of $1.1 million. Con Edison would contribute up to 28% of the cost of remediating these two properties until the costs reached $1.1 million (for a share of $308,000), and would pay for 100% of any additional remediation costs up to $4 million. The parties agreed that Con Edison would retain the right to petition the court for relief and to reopen the settlement if the remediation costs unexpectedly exceeded $4 million. May 7, 2003 Tr. at 3:4-6; 4:24-5:2. The parties also stated that Con Edison would control the actual cleanup process, in accordance with the

Voluntary Cleanup Agreement ("VCA") reached between defendants and the New York State Department of Environmental Conservation ("DEC"). Id. at 23:8-12.

At the May 2003 conference, the parties decided to defer the signing of a final agreement for about 120 days, to allow defendants' expert to conduct some supplemental investigation of the contaminated sites, and to allow the parties to iron out some issues about the implementation of the agreement. See id. at 27:18-28:12, 31:11-17. This delay was requested by defendants, who wanted to be sure that DEC would not order Con Edison to demolish or excavate through the floor slab of the existing Fyn Paint factory building in the course of the site cleanup. Id. at 9:9-15, 11:5-19. The delay in finalizing settlement terms was agreed to by the parties, despite the stated objections of Con Edison's Vice President for Regulatory Affairs Chanoch Lubling, who stated that Con Edison would prefer to finalize the settlement immediately rather than create an unnecessary "two-step process." Id. at 20:14-25; 21:14-20.

Despite the agreed-upon delay, the parties confirmed the court's assessment that they had committed to a comprehensive settlement. See id. at 24:11-14.[2] The court explained that the

---

[2] THE COURT: "Unless I'm persuaded that [additional investigation uncovered] something that nobody could possibly have contemplated and would be grossly unfair to either or both parties, as far as I'm concerned, the case is settled today."

parties were permitted to negotiate the final terms of the agreement, but only "on the condition" that such discussions would not "upset this settlement." Id. at 31:11-32:11. The court made clear that if the parties failed to reach agreement on additional terms, then the settlement would consist of the terms already agreed to on the record, plus any terms added by the court to implement the existing agreement. See id. at 33:3-4 ("[T]he settlement is what I put on the record and any omitted terms, I fill in.").

The subsequent investigation and discussions took longer than the expected 120 days. Dan Buzea ("Buzea"), who serves as Fyn Paint's environmental consultant, attests that the Supplemental Remedial Investigation ("SRI") report was submitted to DEC and Con Edison approximately three weeks late on October 1, 2003. Decl. of Dan Buzea, dated Dec. 12, 2007 ("Buzea Decl.") at ¶ 33. The parties held a scheduled status conference on December 8, 2003, but agreed to hold off the final signing of the settlement agreement until after DEC had formally responded to the parties' submissions. See Minute Entry for Settlement Conference Held Before Judge David G. Trager on 12/8/2003. The DEC did not respond to the SRI report until February 17, 2004, when the DEC declared that the report was "approvable" upon the condition that Fyn Paint agreed to additional investigation and reporting requirements. See Letter from DEC to Dan Buzea (Feb.

17, 2004), attached as Buzea Decl. Ex. F .

In the meantime, however, the parties began almost immediately to disagree over the implementation of the settlement agreement. For example, on February 4, 2004, while the DEC's formal written response was pending, Con Edison sent a letter to the court complaining that defendants were failing to comply with DEC's interim requirements, and maintaining that defendants' "VCA with [DEC] is at risk of being terminated for their continuing noncompliance." Letter from Lawrence Menkes to Judge Trager (Feb. 4, 2004) at 2. Con Edison expressed its concern that defendants' noncompliance with DEC would "jeopardize[] the settlement." Id.

On March 23, 2004, defendants responded to Con Edison's concerns by announcing that "based upon the results of the prior investigation, sufficient data now exists to permit the parties to finalize the settlement." See Letter from Nicholas Ward-Willis to Judge Trager (March 23, 2004) at 2. Defendants stated that, based on the supplemental investigation, they did not believe that the remediation costs would exceed the figures discussed at the May 2003 conference. Id. Defendants also stated that they had incurred expenses in excess of $125,000.00 to perform the investigation and remediation work to date, but that additional work would be difficult to fund prior to finalizing the settlement due to defendants' limited resources.

7

Id. Defendants asked to schedule an initial conference to resolve pending third-party insurance actions, and then to schedule a conference between Con Edison and defendants to finalize the settlement agreement. Id.

Defendants' primary focus in the subsequent months was on their third-party insurance actions, which they had brought so they could use the money from the insurance actions to fund the required remediation. Then, on September 3, 2004, defendants sent a letter to DEC asking for an adjournment of the dates in its VCA, claiming that it could not afford to comply with its obligations under the VCA while also litigating with Con Edison and its insurance carriers.[3] Con Edison responded by complaining to the court about defendants' delays and asking for a conference for the "purpose of bringing long overdue closure to this matter." Letter from Chanoch Lubling to Judge Trager (Oct. 4, 2004) at 3. Defendants, however, continued to insist that the finalization of the settlement with Con Edison should await the resolution of the insurance actions. Letter from Nicholas Ward-Willis to Judge Trager (Oct. 15, 2004) at 2.

The record shows a pattern of continued attacks between the parties over the subsequent two years. Con Edison complained repeatedly about defendants' failure to comply with remediation

_____

[3] This letter was submitted by Con Edison to the court as an attachment to the October 4, 2004 letter from Con Edison VP-Regulatory Services Chanoch Lubling.

requirements under the VCA.  Defendants, meanwhile, insisted that

they were cooperating with DEC, indicated that insurance

settlements had lifted the remaining barrier to compliance with

the agreement, and blamed Con Edison for "placing obstacles [and]

adding needless work and costs to the project."  Letter from

Nicholas Ward-Willis to Judge Trager (Aug. 24, 2005) at 1.[4]

On February 14, 2006, Con Edison submitted a pre-motion

conference letter, pursuant to individual chamber rules, stating

that it was prepared to file a motion to ask "that the tentative

settlement be declared at an end and that the matter be scheduled

for trial."  Letter from Lawrence Menkes to Judge Trager (Feb.

14, 2006) at 3.  Con Edison claimed that defendants had

repeatedly failed to conduct required remediation work, and that

"[d]efendants' chronic refusal to perform has . . . deprived Con

Edison of the benefits of the settlement."  Id. at 2.  Con Edison

stated that it had complied with its obligations under the

settlement by paying $33,235.25 in remediation costs to DEC,

although Con Edison now characterized this payment as money

"advanced on defendants' behalf."  Id. at 1.

Rather than vacate the settlement, however, defendants were

---

[4] The court has also repeatedly criticized Con Edison for
unnecessarily interfering with the cleanup process.  At one point
the court, frustrated by Con Edison's interference, decided to
directly involve DEC in these proceedings, so that DEC and the
parties' environmental consultants could report on the progress
at the cleanup site without the intrusion of counsel from either
side.  See, e.g., Dec. 13, 2006 Tr. at 2-13.

instructed by the court to provide a series of periodic status reports to ensure that the required remediation work was proceeding at a pace acceptable to DEC. The next correspondence from Con Edison, sent to the court on May 8, 2006, indicated that – although Con Edison continued to dispute whether defendants were in full compliance with the VCA – the parties all believed they remained bound by the May 2003 settlement agreement. <u>See</u> Letter from Lawrence Menkes to Judge Trager (May 8, 2006) at 2 ("Con Edison respectfully requests that the court once again emphasize to defendants the need for compliance and the benefits to be achieved for all <u>under the settlement</u>." (emphasis added)).

The next status conference between the parties was held on December 13, 2006 with the additional participation of DEC. The DEC representative confirmed that the state agency had considered "pull[ing] the plug" on the VCA due to defendants' failure to move remediation forward in a timely manner, but added that the agreement would remain in place due to "some forward progress." Dec. 13, 2006 Tr. at 2:22-3:1. Defendants agreed to comply with additional deadlines set by DEC to ensure timely compliance with the VCA. Critically, however, despite their ongoing disputes over compliance and implementation, the parties remained committed to the May 2003 settlement agreement. At the conclusion of this conference, defendants requested a final order to memorialize the agreement, so that the parties would no longer

need to rely on the May 2003 conference transcript. Con Edison indicated its assent to that request. Id. at 14:2-10. The parties were instructed to prepare an order for submission.

After the December 13, 2006 conference, the parties appear to have negotiated the terms of a final stipulated judgment in earnest. However, in three subsequent status conferences – held on April 24, 2007, July 17, 2007 and October 9, 2007 – the parties noted their continued disagreement over a limited number of specific and discreet issues, and their resulting inability to agree on a final stipulation. At the October 9, 2007 conference, the parties indicated that they could not agree on a final stipulation, due to disagreements over Con Edison's demand that a party be named as a successor or guarantor to ensure future compliance with the settlement agreement after Fyn Paint and Feinstein had completed their remediation payments. Accordingly, defendants were instructed to submit the agreed-upon terms to be entered as a judgment to implement the May 2003 settlement agreement. Defendants submitted their proposed judgment on October 18, 2007. Defendants submitted an amended proposed judgment on March 26, 2008 to include subsequent remediation payments made by defendants while this decision was pending.

Con Edison responded to defendants' proposed judgment by filing a memorandum of law on November 2, 2007 claiming (1) that the May 2003 settlement was unenforceable due to the failure of

defendants to meet four purported "conditions precedent" to the agreement; (2) that the settlement was unenforceable due to defendants' breach of the agreement; and (3) that the proposed judgment failed to represent the terms agreed upon by the parties. The proposed judgment submitted by defendants, together with Con Edison's objections and defendants' responses, are now before the court.

## Discussion

A settlement agreement is a binding and enforceable contract between the parties, which is subject to general principles of contract law. Delyanis v. Dyna-Empire, Inc., 465 F. Supp. 2d 170, 173 (E.D.N.Y. 2006) (applying New York contract law to enforce settlement agreement between parties in federal court). Under New York law, an agreement is enforceable if it is endorsed by the parties to a lawsuit or their counsel in open court. N.Y. C.P.L.R. § 2104. Once parties agree on the record to a settlement, they may not set that agreement aside without a valid basis. Downes v. O'Connell, 103 F. Supp. 2d 579, 582 (E.D.N.Y. 2000) ("The court will set aside or modify the terms of a settlement reached in open court only upon a showing of good cause, such as fraud, collusion, mistake, accident, or lack of authority."). The New York Court of Appeals has explained:

> Stipulations of settlement are favored by the courts and not
> lightly cast aside. This is all the more so in the case of

> "open court" stipulations within CPLR 2104, where strict
> enforcement not only serves the interest of efficient
> dispute resolution but also is essential to the management
> of court calendars and integrity of the litigation process.
> Only where there is cause sufficient to invalidate a
> contract, such as fraud, collusion, mistake or accident,
> will a party be relieved from the consequences of a
> stipulation made during litigation.

Hallock v. State of New York, 64 N.Y.2d 224, 230, 474 N.E.2d
1178, 485 N.Y.S.2d 510 (1984).

Where parties agree to a settlement on the record, but are
unable to agree upon the final terms to implement their
agreement, a district court has the authority to issue a
"settlement judgment" to effectuate the settlement agreement.
Manning v. New York Univ., 299 F.3d 156, 163 (2d Cir. 2002);
Janus Films, Inc. v. Miller, 801 F.2d 578, 582 (2d Cir. 1986).  A
settlement judgment is issued when the parties agree through
settlement negotiations "on the components of a judgment,
including the basic aspects of relief, but not on all the details
or the wording of the judgment.  Although the components of the
agreement are usually reported to the court on the record, a
district court nonetheless is obliged to determine the detailed
terms of the relief and the wording of the judgment."  Manning,
299 F.3d at 163 (internal punctuation and citations omitted).  "A
court's authority to enforce a settlement by entry of judgment in
the underlying action is especially clear where the settlement is
reported to the court during the course of . . . courtroom
proceedings."  Janus Films, 801 F.2d at 582.  Such a settlement

13

agreement, made by the parties on the record, empowers a court

"to enter a settlement judgment, implementing but not expanding

upon the parties' settlement agreement." Id.; see also Manning,

299 F.3d at 163.  As with any contractual agreement, a

"'plaintiff's change of mind does not excuse her [or him] from

performance of her [or his] obligations under the settlement

agreement,'" even in a case where a district court must use its

authority to direct the final terms of that agreement.  Manning

v. New York Univ., 299 F.3d at 164 (2d Cir. 2002) (quoting Evans

v. Waldorf-Astoria Corp., 827 F. Supp. 911, 914 (E.D.N.Y. 1993));

see also Janus Films, 801 F.2d at 583 (2d Cir. 1986) (explaining

that a party may not "walk away from the settlement simply

because he changed his mind").


**(1)**

**None of Con Edison's Purported "Conditions Precedent" Provide a
Basis for Setting Aside the Settlement Agreement**

Con Edison now claims that the May 2003 agreement was merely

a "settlement in principle" that was unenforceable until certain

conditions precedent were met.[5]  Cf. Office of Comptroller

_____

[5] In contrast to its current argument, in the past Con
Edison has repeatedly portrayed the parties' agreement as a
settlement agreement.  See, e.g., Letter from Lawrence Menkes to
Judge Trager (Sept. 12, 2006) ("The court's involvement at [the
June 22, 2005 status conference] was instrumental in keeping the
work moving forward as part of the comprehensive settlement that
the court established in May 2003." (emphasis added)).  Although

14

General of Republic of Bolivia v. International Promotions &
Ventures, Ltd., 618 F. Supp. 202, 207 (S.D.N.Y. 1985) (explaining
that failure to satisfy a contractual condition precedent can
relieve a party from an obligation to perform under the
contract).  Con Edison claims that defendants' failure to satisfy
those conditions renders the agreement unenforceable.  But none
of the four issues raised by Con Edison was actually a "condition
precedent" to the agreement reached by the parties on May 7,
2003.  Moreover, none of these issues would create a valid basis
for rescinding the settlement agreement under any other theory of
contract law.  Therefore, this settlement agreement remains
enforceable, and a settlement judgment will be entered in order
to implement the parties' agreement.


**a.    Defendants' Failure to Submit Supplemental Remedial
       Investigation Report Within 120 Days**

        Con Edison's first claim is that defendants failed to submit
their Supplemental Remedial Investigation ("SRI") report to DEC
within 120 days, pursuant to the parties' agreement at the May 7,

---

Con Edison now describes the agreement as a "settlement in
principle," it has not provided any case law to give legal
meaning to this new characterization of the agreement.  Con
Edison also fails to suggest that a purported "settlement in
principle," agreed to in open court and repeatedly reaffirmed by
the parties, would be any less enforceable than a "settlement
agreement."  Despite Con Edison's repeated invocations of a
"settlement in principle" in its briefing papers, this settlement
is an enforceable agreement between the parties and it will be
treated as such.

2003 conference. Con Edison claims that the supplemental

remedial investigation remains incomplete, so that the parties do

not have the information needed to "enable them to determine

whether the settlement in principle should be consummated."

Pl.'s Mem. in Opp. to Defs.' Proposed Order of Settlement and

Dismissal ("Pl.'s Mem.") at 7. Con Edison argues that this

required investigation is an unfulfilled condition precedent that

nullifies the settlement agreement.

Con Edison, however, mischaracterizes the parties'

discussion of the SRI report at the May 2003 conference. Con

Edison is correct that the parties agreed to postpone the final

signing of a consent agreement until after defendants'

consultants filed an SRI report, which defendants estimated would

take 120 days. However, this postponement (which was requested

by defendants and which, interestingly, Con Edison insisted was

unnecessary) was not to uncover information that would allow the

parties to decide whether to enter a proposed agreement. Rather,

it was to confirm the accuracy of the parties' existing

agreement, and to reassure defendants that the remediation plan

would not lead to unexpected damage to their property.

As such, the additional site assessment was not a "condition

precedent." At most, this assessment could be described as a

"condition subsequent," which "does not delay the enforceability

of a contract, but rather only preserves the possibility that the

16

contract may be set aside later in time if the condition is not fulfilled." 22 N.Y. Jur. 2d Contracts § 263 (2008). <u>See Miller v. Lou Halperin's Stations, Inc.</u>, 284 A.D.2d 439, 441, 726 N.Y.S.2d 701, 703 (2d Dep't 2001) (rejecting defendant's claim that a contract's environmental cleanup provision was a condition precedent; instead concluding that "[t]he plaintiffs' obligation to perform an environmental cleanup of the property, in the event contamination was discovered, was to act as a condition subsequent, such that the defendant's obligations under the agreement remained in effect pending possible nonoccurrence of the condition subsequent"). In other words, the settlement between Con Edison and defendants was enforceable as of May 7, 2003, although the later discovery of truly unexpected additional contamination could nullify the settlement agreement.

Con Edison also exaggerates the true delay in the completion of the SRI report. Fyn Paint's environmental consultant submitted the SRI report to DEC and Con Edison approximately three weeks late on October 1, 2003. Buzea Decl. at ¶ 33. The DEC did not respond to the SRI report until February 17, 2004, when the DEC declared that the report was "approvable" upon the condition that defendants comply with additional remedial investigation and reporting requirements. Letter from DEC to Dan Buzea (Feb. 17, 2004), attached as Buzea Decl. Ex. F. It was not until March 23, 2004 that Fyn Paint sent a letter to the court

announcing that "based upon the results of the prior
investigation, sufficient data now exists to permit the parties
to finalize the settlement."  Letter from Nicholas M. Ward-Willis
to Judge Trager (March 23, 2004) at 2.  But from that point on,
the parties agreed that sufficient investigation had been
completed to finalize their agreement.  For example, although Con
Edison complained in October 2004 that "there are still
significant portions of the investigation that remain incomplete
due to defendants' chronic failure to honor extended deadlines
repeatedly obtained from DEC," Con Edison nonetheless asked for a
conference to finalize the settlement and "bring[] long overdue
closure to this matter."  Letter from Chanoch Lubling to Judge
Trager (Oct. 4, 2004) at 2-3.

Finally, Con Edison's current claim that the SRI report
remains incomplete is inconsistent with the parties' expectations
at the May 2003 conference.  In part, Con Edison's current
position conflates the additional investigation that the parties
agreed to on May 7, 2003 with the additional work plan
development that would grow out of that investigation.  See
Menkes Decl. ¶ 9 (asserting that defendants' October 2003 SRI
report was deficient because it "did not include essential
components of the SRI Work Plan established by DEC" or "a
proposed Remedial Action Work Plan"); Schwetz Decl. ¶ 7(c).  As
defendants explain, the Remedial Action Work Plan could not have

18

been prepared until after the SRI investigation was completed and accepted by DEC.  Buzea Decl. ¶ 32.  Con Edison clearly understood this procedure.  At the May 7, 2003 conference, it was Con Edison's lawyers who explained to the court that a remedial plan could not be designed until after DEC had reviewed the results of the supplemental investigation.  May 7, 2003 Tr. at 12:12-23.  There is no way that the parties, when agreeing to a 120-day extension for the completion of the SRI report, could have expected that a remedial plan would be in place prior to the signing of a final settlement.  Instead, the clear expectation of the parties at the settlement conference was that the final agreement would be put off until enough additional investigation was done to assure the parties (specifically, Fyn Paint) that no unanticipated costs or remedial actions would be required.

In short, despite some delays in the SRI report, defendants told the court in March 2004 that the supplemental investigation had progressed to a point where defendants were ready to finalize the settlement agreement.  Con Edison similarly sought to finalize the agreement in October 2004 in spite of its complaints about the progress of the supplemental investigation. Con Edison cannot now reverse course and claim that the supplemental investigation conducted by Fyn Paint was a "condition precedent" that has not been met.

**b.    Results of Defendants' Supplemental Investigation**

Con Edison's second claim is that defendants' SRI report, to the extent it has been completed, has not confirmed the parties' expectations.  Con Edison claims that the investigation has shown the contamination to be more severe than expected, and the cleanup more costly than expected, which Con Edison maintains should also nullify the settlement agreement.

The parties dispute whether site investigations since May 7, 2003 have identified any unexpected contamination.  The declaration submitted by Con Edison's environmental consultant, Edward Schwetz ("Schwetz"), maintains that Fyn Paint's SRI report showed that "the contamination from the Fyn Paint Site is more severe and has spread further and in different directions than had been anticipated prior to the receipt of the report." Schwetz Decl. ¶ 10.  Specifically, Schwetz argues that the contamination data from certain of the monitoring wells on or near the Fyn Paint site were higher than expected.  Id.  Schwetz concludes that, at the time of the May 2003 settlement conference, he and Con Edison "had not anticipated that the contamination from the Fyn Paint Site had reached numerous other properties in the neighborhood, significantly increasing the complexity and cost of the appropriate response associated with taking on responsibility for remediating neighboring residential

and other properties." Id. ¶ 11.

Fyn Paint's expert, Dan Buzea, states that the finding of
five feet of free phase product in one of the monitoring wells,
which Con Edison's expert described as the "most suprising data
presented in the SRI report," Schwetz Decl. ¶ 10(a), was an
erroneous reading, Buzea Decl. ¶ 38.  Otherwise, however, Buzea
does not specifically rebut Schwetz's conclusions that the
supplemental investigation showed a surprising amount of
contamination in certain of the monitoring wells.  Instead, Buzea
insists that "[t]he statement in Mr. Schwetz' declaration that
the contamination at the present time is much more severe than it
was in May, 2003 is erroneous." Id. ¶ 39.  This argument,
however, misses the point.  Con Edison is not claiming that the
contamination has worsened since May 2003.[6]  Con Edison is,
instead, claiming that the contamination was materially more
significant than anticipated when it agreed to the settlement in
May 2003, and that the additional unanticipated cleanup costs are
a basis for rescinding the May 2003 settlement agreement.

Even accepting Con Edison's claim that the SRI report
uncovered greater contamination than it anticipated, however,

_____

[6] To the extent that it would be relevant, Fyn Paint has
effectively shown that "concentrations of all four (4) major
chemicals in the groundwater (toluene, ethylbenzene, xylene and
acetone) have remained relatively stable" since May 2003.  Buzea
Decl. ¶ 39.  Maps of the contamination plume illustrating data
from August 2003 through November 2007 do not show any
significant contaminant migration.  Id. ¶ 40 & Exs. G-K.

there is no evidence that this additional contamination reaches the extremely high threshold that was set in May 2003 for destroying the parties' settlement agreement.  <u>See</u> May 7, 2003 Tr. at 24:11-14.[7]  Con Edison has been privy to this data throughout the investigation and cleanup work.  Nonetheless, Con Edison does not point to any evidence that it was shocked by the extent of the contamination found since May 2003, prior to the November 2, 2007 declaration of its expert prepared in opposition to the proposed judgment.  <u>See</u> Menkes Decl. ¶¶ 16-18. Accordingly, there is insufficient evidence to support Con Edison's claim that the investigation has uncovered a level of contamination "that nobody could possibly have contemplated" at the May 7, 2003 conference.  <u>Id.</u> ¶ 18 (quoting May 7, 2003 Tr. at 24:11-12).

Absent a material mistake about the degree of existing contamination, all that Con Edison can claim is that the parties' expectations about cleanup costs were incorrect.  But as a matter of law, a party's mistaken estimates about future costs or liabilities is not the type of mistake that can permit rescission of an agreement.  The Third Circuit (reviewing Pennsylvania cases, but applying general contract principles that are equally

---

[7]  THE COURT:  "Unless I'm persuaded that it was something that nobody could possibly have contemplated and would be grossly unfair to either or both parties, as far as I'm concerned, the case is settled today."

applicable here) has explained that "underestimating damages or entering into a settlement before damages are adequately assessed is not a mutual mistake of fact" that would permit rescission of a settlement agreement. CONRAIL v. Portlight, Inc., 188 F.3d 93, 96 (3d Cir. 1999). This rule is necessary to prevent parties from backing out of settlement agreements anytime their injuries turned out to be greater than anticipated. "Were there not such a rule, the effectiveness of settlement agreements would be greatly diminished." Id. at 97. New York contract and settlement cases provide the same result. See Leasco Corp. v. Taussig, 473 F.2d 777, 781 (2d Cir. 1972) (rescission of an agreement not permitted because parties' financial predictions were incorrect); Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc., 723 F. Supp. 976, 994 (S.D.N.Y. 1989) (failure to predict future events is not a mistake that would permit rescission of an agreement); In re Bradlees Stores, Inc., 291 B.R. 307, 312 (Bankr. S.D.N.Y. 2003) (mistaken speculation about future events is not a basis for relieving a party from obligations under a settlement agreement); 22 N.Y. Jur. 2d Contracts § 121 (2008) ("Where the parties know there is doubt as to a certain matter and contract on that assumption, the contract is not rendered voidable because one is disappointed in the hope that the facts accord with his or her wishes."); Restatement 2d of Contracts § 151 (explaining that "[a] party's prediction or

judgment as to events to occur in the future, even if erroneous, is not a 'mistake'" that would permit rescission of an agreement).

In any event, the record suggests that, even if the costs of remediation may be higher than estimated, these costs are within the range that was anticipated by the parties in May 2003. According to Con Edison's expert,

> At the time of the May 2003 Court conference, Con Edison estimated that the costs of cleanup would be between $1.1 and $1.7 million. However, because the SRI Report identified more severe contamination issues, the potential costs of cleanup have increased substantially. In my professional opinion, the projected costs to clean up known contamination originating from the Fyn Paint Site (i.e., not taking into account the uncertainty regarding the extent of the contamination) is now well in excess of the upper end of the range estimated in May 2003.

Schwetz Dec. ¶ 23. Fyn Paint's expert counters that "[t]he costs to continue and complete the remediation have been estimated by me and are well within the numbers discussed at the May 7, 2003 conference and well below $4 million." Buzea Decl. ¶ 42. Buzea does not offer a specific current cost estimate, other than a belief that costs will be under the $4 million cap. See id. ¶¶ 20, 29, 41-42. At most, these experts suggest that the costs will fit within a range of $1.7 million to $4 million, which was within the range of costs deemed acceptable by the parties in May 2003.

Most importantly, to the extent that the parties may have underestimated the costs of remediation, the terms of this

settlement – under which Con Edison agreed to pay any costs in excess of the $1.1 million estimate so long as those costs did not exceed $4 million – show that Con Edison assumed that risk. Chanoch Lubling, Con Edison's Vice President for Regulatory Services, made that assumption of risk clear at the May 7, 2003 conference.  May 7, 2003 Tr. at 5:22-23 ("[Y]ou accepted our estimate and we're living by it."); id. at 4:17-20 ("I don't think it would be more than $4 million, but leaving it open ended puts me at some great, great exposure that I'm an idiot, because until you dig, you don't know.").[8]  The agreement recognized and limited Con Edison's assumption of risk, by permitting Con Edison to return to court if its expectations were truly erroneous and remediation costs exceeded $4 million.  See May 7, 2003 Tr. at 4:24-5:2.[9]  Under such circumstances, Con Edison cannot now claim that remediation costs create a basis for setting aside the agreement.  See Ostman v. St. John's Episcopal Hosp., 918 F. Supp. 635, 646 (E.D.N.Y. 1996) (finding that plaintiff's "failure to estimate accurately the amount" of future liability during settlement negotiations was not a basis for rescinding agreement,

_____

[8] Notably, Con Edison made this commitment despite the court's own warning that its cost estimates appeared to be overly "optimistic."  May 7, 2003 Tr. at 28:16-17.

[9] MR. LUBLING: "[I]f for some unknown reason it's more than $4 million, then we all were misled by this whole settlement. We'll come to [the court] and if you say, no, Con Ed, it's your property, do it, we're stuck with it."

in part because plaintiff's expectations "constituted a risk that the plaintiff freely undertook as part of his bargain").

In addition, Con Edison has repeatedly reiterated its commitment to these numbers, long after it would have been aware of any possible increase in remediation costs.  In fact, Con Edison sent a letter to the court reiterating this commitment only two and a half months before filing its brief in opposition to the settlement.  <u>See</u> Letter from Lawrence Menkes to Judge Trager (Sept. 14, 2007) at 3 ("Con Edison is willing to commit a very considerable sum of money to this settlement (up to $3.208 million) in return for defendants' commitment to carry out the VCA with the DEC.").  Con Edison did not raise the costs of remediation during its extensive discussions with defendants and the court about a final settlement agreement.  Instead, the record shows only that the parties could not agree about what to do in the event that cleanup costs exceeded $4 million.

In short, Con Edison committed to this agreement in May 2003 based on its own estimate of the cleanup costs.  Con Edison assumed the risk that costs would exceed expectations, so long as those costs did not exceed $4 million.  Con Edison has repeatedly reaffirmed this commitment.  The parties' estimate of the cost of remediation, therefore, is not a condition precedent, and does not provide a basis for setting aside the agreement.

**c.  Con Edison's Claims About Defendants' Financial Condition**

Con Edison's third claim is that defendants have misrepresented their financial status.  Specifically, Con Edison complains that defendants' financial affidavit "is materially inaccurate because it places no value on real estate [the Fyn Paint site] for which defendants have signed a contract of sale for millions of dollars and which apparently does not have a mortgage."  Menkes Reply Decl. ¶ 13.  Con Edison argues that this is a basis for setting aside the agreement because the settlement was predicated on defendants' inability to pay a higher percentage of cleanup costs.

According to a confidential financial affidavit submitted to the court on May 6, 2003, defendant Feinstein owns a 50% interest in Kent River, whose sole asset is the Fyn Paint site.  Feinstein swore in his affidavit that "[d]ue to the significant contamination on this property, it currently is not marketable and has no value."  Confidential Financial Disclosure Affidavit of William Feinstein, dated May 6, 2003, at ¶ 8.  Con Edison argues that this affidavit is inaccurate because defendant Kent River subsequently entered into a contract for sale of this property.  The terms of this contract for sale have not been disclosed, but defendants report receiving a down payment of $750,000 from the prospective purchaser.  Menkes Decl. ¶ 22.

According to defendants, the property sale cannot close until after the final settlement judgment in this case is issued. Defendants also state that the property sale is "specifically conditioned upon the remediation of [the] Fyn Paint property and the Con Edison property being completed in accordance with the Voluntary Cleanup Agreement (the 'VCA') between the Defendant Fyn Paint and DEC." Beane Decl. ¶ 32.

Con Edison explained at the May 7, 2003 conference that defendants' financial status was a critical component of the settlement agreement, because Con Edison was required to show to its management that it had reached the best deal possible. May 7, 2003 Tr. at 38:9-10. Nonetheless, Con Edison also conceded that the only relevant information was the state of defendants' finances "at the time of the settlement." Id. at 37:19-20. Con Edison specifically stated on the record that any change in defendants' financial status after the settlement was irrelevant to the parties' agreement. Id. 39:16-17.

Con Edison cannot reasonably claim that it was unaware in May 2003 that the Fyn Paint site was a significant asset owned by defendants, or that defendants were likely to sell this property in the future. Defendants repeatedly made it clear that Feinstein, who was over seventy-five years old at the time of the May 2003 settlement, planned to retire and leave New York as soon as this dispute was resolved. Defendants also point out that

"just prior to entering into the Settlement reflected by the May 7, 2003 Transcript, Con Edison rejected the opportunity to acquire ownership of the Fyn Paint property."  Defs.' Mem. at 8. Prior to reaching the May 2003 agreement, defendants even offered to transfer the Fyn Paint site to Con Edison at no cost as part of a proposed settlement, a generous offer that was made so that Feinstein could walk away from this litigation.  Con Edison refused to take this deal, stating that it was not in the business of buying property, even though Con Edison should have known that property values in this South Williamsburg neighborhood were continuously increasing, and that the value of this site after cleanup would be significant.  In any event, Con Edison always knew that defendants were planning to sell this property.  Con Edison cannot now criticize defendants because they were required to hold onto this property for so long that its value increased.

The real issue, therefore, is that Con Edison knew about this asset but significantly underestimated its value. Defendants did not hide any financial facts from Con Edison when the settlement was reached, although it appears that they also underestimated the future value of this property when agreeing to the settlement.  But as explained in the previous discussion about remediation costs, the parties' mistaken financial predictions do not create a legal basis for nullifying the

settlement agreement.

In short, when the parties reached this settlement agreement in May 2003, Con Edison was well aware that this property was an asset owned by defendants. Con Edison was also well aware that Feinstein wanted to retire, and that defendants planned to sell this property. The fact that the Fyn Paint site may now have a greater value than it did when the parties agreed to the May 2003 settlement is no basis for setting aside the agreement.

**d. Con Edison's Claims About the Cost of the SRI Report**

Finally, Con Edison claims that the costs of the supplemental remedial investigation greatly exceeded defendants' estimate of $100,000, and that this represents a fourth condition precedent that has not been met. Under the May 2003 agreement, defendants were allowed to credit the cost of this additional investigation toward their share of the total remediation costs. Con Edison claims that unexpected contamination, along with "defendants' chronic bad faith delays," has led to a far more costly investigation than anticipated. Menkes Reply Decl. ¶ 10. Although it is unclear how much the supplemental investigation has cost, Con Edison claims it represents a significant portion of the approximately $500,000 in costs that defendants have incurred so far. Menkes Decl. ¶ 30.

First, there is no way that confirmation of this $100,000

estimate could realistically be considered a "condition precedent" of the settlement. Con Edison agreed at the May 7, 2003 conference that any supplemental investigation costs would be credited toward defendants' share of the cleanup. May 7, 2003 Tr. at 18:15-17;[10] 27:23-24. This conformed with the parties' agreement, because the investigation work was part and parcel of the entire remediation process. Although Con Edison asked for assurances about the cost of the SRI report, id. at 34:25-35:9, at no time did the parties give any indication that the agreement would be nullified if the costs exceeded $100,000.

Second, there is no clear evidence in the record about the actual cost of the October 2003 SRI report. In March 2004, when defendants reported that they had completed enough of the supplemental investigation to confirm costs and cleanup requirements to their satisfaction, they reported that the investigation and remediation work to date had cost approximately $125,000. Letter from Nicholas Ward-Willis to Judge Trager (March 23, 2004) at 2. Although Con Edison claims the costs of supplemental investigation to date have been much higher, the approximately $500,000 billed to defendants so far also includes the costs of interim remediation and development of a final work plan, neither of which could reasonably be part of the 120-day

_____

[10] THE COURT: With the understanding, whatever this thing costs is going to be accredited toward the [$]800,000.
        MR. LUBLING: That's all part of the work.

project discussed at the May 2003 conference. Even if defendants have been required to perform additional supplemental investigation since the initial SRI report, there is no reason that those costs should not be considered part of the overall remediation project, as anticipated at the May 2003 conference. Therefore, although the $100,000 estimate may have been low, there is no evidence to show that the actual cost of the SRI report discussed at the May 2003 conference was materially different from what the parties anticipated, much less that this estimate was a condition precedent to the overall agreement.

Moreover, as with all of Con Edison's complaints about the allegedly rising costs of this project, the time to discuss these issues has long since past. As noted already, Con Edison repeatedly reaffirmed – to the court and the other parties to this case – its commitment to spend "up to $3.028 million" as part of this settlement. Letter from Lawrence Menkes to Judge Trager (Sept. 14, 2007) at 3. Con Edison never raised any concerns about the rising cost of the supplemental remedial investigation, even while it was engaged in almost ten months of negotiations (between December 13, 2006 and October 9, 2007) over a final stipulated judgment in this case. Even if these claims had any merit, Con Edison cannot now raise these issues solely as an excuse to scuttle the parties' agreement.

**Principles of Waiver and Estoppel Prevent Con Edison From Raising
Its "Condition Precedent" Claims at this Time**

Even if enforcement of the settlement agreement was
contingent on any of the conditions cited by Con Edison,
defendants correctly argue that Con Edison has waived its right
to enforce these conditions and should be estopped from doing so.

A party has waived a right under an agreement when it
voluntarily and intentionally abandons the enforcement of that
right. Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield
of N.J., Inc., 448 F.3d 573, 585 (2d Cir. 2006); Nassau Trust Co.
v. Montrose Concrete Products Corp., 56 N.Y.2d 175, 184, 436
N.E.2d 1265, 1269-70, 451 N.Y.S.2d 663, 668 (1982). "Waiver may
be established by affirmative conduct or by failure to act so as
to evince an intent not to claim a purported advantage." Gen.
Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist., 85
N.Y.2d 232, 236, 647 N.E.2d 1329, 1331, 623 N.Y.S.2d 821, 823
(1995). "Because waiver of a contract right must be proved to be
intentional, the defense of waiver requires a 'clear
manifestation of an intent by plaintiff to relinquish her known
right' and 'mere silence, oversight or thoughtlessness in failing
to object' to a breach of the contract will not support a finding
of waiver.'" Beth Israel, 448 F.3d at 585 (quoting
Courtney-Clarke v. Rizzoli Int'l Publ'ns, Inc., 251 A.D.2d 13,
13, 676 N.Y.S.2d 529 (1st Dep't 1998)).

Con Edison has waived its right to enforce any of these purported conditions by failing to invoke them until now. All of Con Edison's current claims are based on facts that have long been known to Con Edison. Some of these claims date back to the period immediately after the agreement was reached in May 2003. Yet Con Edison failed to raise any of these issues until after defendants submitted a proposed judgment in October 2007.

The most recent course of conduct between the parties illustrates that Con Edison has waived any of these claims. Con Edison and defendants agreed, on the record at their December 13, 2006 status conference, to draft an order that would memorialize the terms of the May 2003 settlement agreement. Dec. 13, 2006 Tr. at 14:2-10. For almost ten months after that conference, the parties negotiated with each other extensively over the terms of a written order. According to defendants, seventeen versions of a stipulation of settlement went back and forth between the parties. Defs.' Mem. at 16. The parties also held three settlement conferences in open court – on April 24, 2007, July 17, 2007 and October 9, 2007 – in which they discussed what were purported to be the only remaining issues preventing the parties from signing an agreement. Con Edison failed to raise these "conditions precedent" at any of these status conferences, or in any of its correspondence to the court. Under such circumstances, Con Edison cannot now claim that these conditions

are a basis for setting aside the agreement.  See Laguardia

Assocs. v. Holiday Hospitality Franchising, Inc., 92 F. Supp. 2d

119, 130 (E.D.N.Y. 2000) (holding that party's failure to enforce

a contract provision for nearly ten months waived the right of

enforcement); Madison Ave. Leasehold, LLC v. Madison Bentley

Assoc., LLC, 30 A.D.3d 1, 7, 811 N.Y.S.2d 47, 52 (1st Dep't 2006)

(finding that course of conduct showing repeated failure to

enforce a contract provision constitutes a waiver of

enforcement).

Defendants also argue that Con Edison should be estopped

from enforcing these purported conditions to its settlement

agreement.  The defense of estoppel is available when one party

to an agreement relies on the words or actions of the other party

to its detriment.  Nassau Trust, 56 N.Y.2d at 184, 436 N.E.2d at

1269, 451 N.Y.S.2d at 667; see also Ostman v. St. John's

Episcopal Hosp., 918 F. Supp. 635, 646 (E.D.N.Y. 1996) ("Under

the law of the Second Circuit, the elements of estoppel are (1) a

representation of material fact, (2) reliance by the aggrieved

party thereon, and (3) injuries resulting from such reliance."

(citations omitted)).  New York courts have invoked principles of

estoppel to enforce settlement agreements where one of the

parties to the agreement relied upon the agreement to its

detriment.  See Board of Trustees of Sheet Metal Workers Local

Union No. 137 v. Vic Constr. Corp., 825 F. Supp. 463, 464

(E.D.N.Y. 1993); <u>Lowe v. Steinman</u>, 284 A.D.2d 506, 507-08, 728

N.Y.S.2d 56, 57 (2d Dep't 2001); <u>Smith v. Lefrak Org., Inc.</u>, 142

A.D.2d 725, 725, 531 N.Y.S.2d 305, 306 (2d Dep't 1988).

Defendants have established that Con Edison should be

estopped from raising any of its above claims as a basis for

setting aside the May 2003 agreement.  First, Con Edison failed

to raise any of these purported conditions precedent to

defendants during their extensive settlement discussions after

December 13, 2006.  Instead, the only issues raised by Con Edison

during that time involved (1) choosing an entity to manage the

remediation work; (2) procedures to implement the agreement if

costs exceeded the $4 million cap or if the remediation was not

completed within ten years; and (3) Con Edison's concern that a

third party guarantee defendants' liability if remediation costs

exceeded $4 million.  Beane Decl. ¶ 48.  Second, defendants

reasonably relied on Con Edison's representations that the May

2003 settlement agreement remained in place with only these three

implementation issues left to be resolved.[11]  Defendants also

---

[11] All of these issues, it should be noted, fell within the
scope of the court's equitable authority to decide minor issues
about the implementation of the agreement.  As such, the parties'
failure to agree on these issues cannot provide a basis for
setting aside the agreement.  Moreover, Con Edison's sudden shift
– from arguing about these implementation details to claiming
that defendants have breached their agreement altogether –
illustrates that Con Edison's current stance is nothing more than
a case of "buyer's remorse" for agreeing to a deal that it now
regrets.

reasonably relied on Con Edison's failure to enforce any of these conditions in a timely fashion. Third, defendants have spent significant sums on remediation since May 2003. Defendants have also secured a purchaser for the Fyn Paint site, in a deal that was contingent on the reasonable expectation that its settlement with Con Edison was about to finalized. These expenditures and other actions are sufficient to show detrimental reliance on Con Edison's failure to enforce any of these conditions throughout the long course of negotiations between the parties.

Therefore, even if any of the conditions cited by Con Edison were in fact conditions precedent, such that Con Edison could be excused from performance of the settlement agreement by defendants' failure to meet these conditions, Con Edison has waived its right to enforce these conditions or, in the alternative, should be estopped from such enforcement.[12]

### (3)

## Con Edison Has Waived Its Claims That Defendants Breached the Contract Since May 7, 2003

The same waiver and estoppel analysis applies to Con Edison's claims that defendants have breached this settlement

---

[12]  Defendants also argue that Con Edison's claims are barred by the doctrine of laches. Because Con Edison's claims have been found to be waived or estopped, there is no need to address defendants' laches argument at this time.

agreement, rendering it unenforceable. Con Edison claims that
defendants have breached the agreement by failing to "discharge
their responsibilities to DEC and the public under the VCA" in
good faith and in a timely manner. Pl.'s Mem. at 14.
Admittedly, Con Edison has repeatedly complained about
defendants' inability to expedite the environmental cleanup of
these properties. Nonetheless, Con Edison has also consistently
acted as if the May 2003 settlement agreement remained in effect,
even while it made these complaints. Most recently, after
December 13, 2006, the parties spent almost ten months
negotiating the final terms of a stipulation to implement and
enforce their agreement. During those negotiations, Con Edison
never suggested that the prior actions of defendants had already
breached this agreement.

    In truth, Con Edison cannot reasonably claim that its
current breach of contract claims were prompted by a breach of
the agreement. In September 2007, shortly before settlement
discussions broke down, Con Edison informed the court of its
inability to reach a final stipulation with defendants. But Con
Edison did not claim that defendants had breached the existing
settlement agreement. Instead, Con Edison only raised a series
of issues related to the future enforcement and implementation of
the existing agreement. For example, Con Edison's primary demand
was to identify a successor "to ensure that the settlement terms

are fully implemented."  Letter from Lawrence Menkes to Judge
Trager (Sept. 14, 2007) at 1.  Con Edison's breach of contract
claims only materialized after defendants submitted a proposed
judgment.  Under these circumstances, Con Edison has waived any
breach of contract claim it may have had against defendants, and
should be equitably estopped from raising such a claim at this
time.

    In any event, Con Edison's breach of contract claim
primarily asserts that defendants have failed to comply with the
VCA and the directions of DEC.  The fact is that the VCA remains
in place.  DEC has evidently concluded that defendants' continued
participation in its Voluntary Cleanup Program is the best way to
protect the public health and welfare.  There is no basis for
second-guessing that conclusion, or for putting the cleanup of
these properties under the VCA at risk by setting aside the May
2003 agreement.


**(4)**

**Con Edison's Claims Regarding the Terms of the Final Judgment**


    Con Edison claims that the proposed final judgment offered
by defendants is unenforceable because there has been no "meeting
of the minds" between the parties.  As already noted, however,
this judgment is not being entered as a stipulation between the

parties. Instead, it is being entered as a "settlement judgment," where the court enforces a settlement agreed to by the parties on the record and fills in any terms necessary to implement and enforce the parties' agreement. See Manning v. New York Univ., 299 F.3d 156, 163 (2d Cir. 2002); Janus Films, Inc. v. Miller, 801 F.2d 578, 582 (2d Cir. 1986). A settlement judgment may properly be based on terms proposed by one or both of the parties, or on language proposed by the court itself. Janus Films, 801 F.2d at 582 ("Since the parties have agreed only upon the basic aspect of relief, the judge is obliged to determine the detailed terms of the relief and the wording of the judgment. . . . In determining the wording of a settlement judgment, the judge proceeds, as with an adjudicated judgment, to draft language, adopt the proposal of the party that effectively 'won,' or adopt portions of draft language proposed by any of the parties.").

In this case, Fyn Paint has submitted a proposed judgment that will serve as the basis for a final judgment entered by the court. Defendants have stated that this language represents the final draft of language that was agreed upon by the parties in their efforts to reach a final stipulation. Beane Decl. ¶¶ 50-51. Con Edison, however, claims that this proposed judgment includes terms to which Con Edison objects, and fails to include terms that Con Edison insisted upon at the May 7, 2003

40

conference.  Menkes Decl. ¶¶ 39-46.  Each of Con Edison's
complaints will be addressed in turn.

### a.    Release of Defendant Kent River

Con Edison complains that the proposed judgment would
release defendant Kent River from liability after defendants have
paid their required contribution under the agreement.  Menkes
Decl. ¶ 40.  This release would prevent Con Edison from pursuing
Kent River if cleanup costs exceeded $4 million.  The Kent River
release was previously cited by Con Edison as a basis for the
parties' inability to reach a final stipulation of settlement.
See Letter from Lawrence Menkes to Judge Trager (Sept. 14, 2007)
at 2-3.

In response, defendants note that Kent River was not an
original party to this suit, and was only added as a defendant in
October 2002 at the request of Feinstein and Fyn Paint to enable
defendants to initiate third-party actions against insurance
carriers.  Beane Decl. ¶ 31.  Defendants state that Kent River's
only asset of value is the Fyn Paint site, and that it will have
no remaining assets of value after the sale of that property.
Letter from Edward Beane to Judge Trager (Sept. 25, 2007) at 2.
Defendants also maintain that the parties had reached agreement
about this provision during their settlement negotiations, and
that the release provision "was included in a number of prior

drafts of the Settlement Agreement." Id.

Nonetheless, there was no discussion at the May 2003 conference of releasing Kent River from liability in the event that remediation costs exceeded $4 million. Although the parties dispute whether they reached any private agreements to release Kent River, there is no suggestion that Con Edison committed to this release on the record. At the April 24, 2007 status conference, defendants proposed to release Kent River from liability, but Con Edison did not comment directly on this issue. Apr. 24, 2007 Tr. at 4:5-10. Instead, to the extent that the release of Kent River was tied up in questions of payment and the parties' escrow agreement, Con Edison's lawyer indicated to the court that he and defendants' counsel had agreed upon a solution but that he still needed to receive client approval. Id. at 4:24-5:1. Therefore, the record suggests that Con Edison never committed to this release as part of the settlement agreement. Moreover, Con Edison complained to the court about this provision in its September 14, 2007 letter, so that (unlike the purported conditions precedent) this is not an issue being raised for the first time in these briefs.

Kent River is not a party to the VCA and is not one of the "remediating defendants" under the terms of the proposed judgment. Therefore, defendants will be allowed to release Kent River from liability for any claims related to the remediation

42

process itself.  However, Con Edison should be permitted to seek money from Kent River in the event that remediation costs exceed $4 million – particularly in light of the fact that Kent River, like Fyn Paint, is largely owned and controlled by Feinstein.

Pursuant to the court's agreed-upon equitable authority to add terms necessary to implement this agreement, defendants' request to release Kent River from liability upon defendants' payment of the remaining settlement funds will be granted.  This release, however, is contingent on remediation costs remaining below $4 million, and will be withdrawn in the event that Con Edison must return to court to pursue claims against defendants due to the fact that remediation costs have exceeded $4 million. Paragraph X(a) of the judgment will now read as follows (with new terms highlighted in boldface):

> Upon payment and deposit by Remediating Defendants of the remaining settlement funds of Two Hundred Sixty-Seven Thousand Thirty-Three and 37/100 ($267,033.37) Dollars as set forth in Paragraph III(e) above, Kent and Con Edison and their heirs, successors, agents, assigns, and former, present or future shareholders, directors, trustees, officers and employees, along with their respective former, present or future transferees and assigns, hereby mutually release, and covenant not to sue each other or commence any action whatsoever for, any Claim based upon or in any way connected to the Environmental Contamination, except as provided in this Settlement Order; **provided however, that this release will not apply to any Claims filed against Kent for the allocation of the cost of remediation work above $4 million; further** provided however, that Con Edison reserves and does not discharge or waive against Remediating Defendants any Claims that Con Edison may have for any environmental contamination or pollution other than the Environmental Contamination that is the subject of the Remediation Work under the VCA.

In addition, all references to "Remediating Defendants" in paragraph III(c) of the proposed judgment will be changed to "Defendants" to make clear that Con Edison is entitled to reassert its claims against Feinstein, Fyn Paint and Kent River in the event that remediation costs exceed $4 million.

**b.  Cap on Con Edison Damages**

Con Edison claims that the proposed judgment does not accurately reflect the agreement to cap Con Edison's liability at $3.208 million.  Menkes Decl. at ¶ 41.  However, the proposed judgment is entirely in accordance with the agreement placed on the record on May 7, 2003.  The proposed judgment states that "[i]f the cost of the Remediation Work on the Defendants' Site and the Con Edison Site exceeds $1.1 Million Dollars, the next $2.9 Million of such cost shall be funded solely by Con Edison (up to a maximum of $4.0 million)."  Proposed J. ¶ III(a).  The proposed judgment further states that if the total costs exceed $4 million, or Con Edison's contribution exceeds $3.208 million, then Con Edison may seek additional contributions from defendants, and may return to court to reassert its claims if that effort fails.  <u>Id.</u> ¶ III(c).  This accurately reflects Con Edison's commitments at the May 2003 conference.  <u>See</u> May 7, 2003

Tr. at 3:4-6.[13]

### c.  Absence of Binding Schedule for Remediation

Con Edison complains that the lack of a binding remediation schedule would allow defendants to delay remediation and "is clearly inconsistent with the settlement in principle."  Menkes Decl. ¶ 42.  However, a binding schedule was never discussed at the May 2003 settlement.  Con Edison has not previously made a demand to set a binding remediation schedule.  Accordingly, there is no basis for amending the agreement to include such a schedule now.

Moreover, although the pace of remediation is a legitimate issue, Con Edison fails to offer any proposals for setting an appropriate schedule.  Rather than offer a constructive solution to improve the implementation of this agreement, Con Edison instead only raises this issue as a basis for setting aside the agreement.

In any event, DEC has supervised the remediation process throughout this litigation, and has indicated its willingness to withdraw the VCA if necessary to enforce the pace of remediation work.  The judgment confirms that remediation work "shall be performed in accordance with the schedule approved by the NYSDEC

---

[13]  MR. LUBLING:  And we didn't say that after $4 million they would be responsible.  If it's $4 million, it's something way different than we all contemplated.  We'd come back to you.

pursuant to the VCA." Proposed J. ¶ II(c). DEC's oversight will remain the appropriate mechanism to ensure that remediation moves forward on an appropriate schedule.

**d.    Failure to Bind Proposed Buyer of the Fyn Paint Site to the VCA requirements**

At the October 9, 2007 status conference, the parties maintained that the only barrier to a stipulated settlement agreement was continued disagreement about the liability of defendants' successors.  Con Edison raises this complaint again in response to the proposed judgment.  Con Edison argues that "[s]ettlements are typically binding on 'successors and assigns,' but nothing in the Proposed Judgment would bind the proposed buyer of the Fyn Paint Site to comply with the Voluntary Cleanup Agreement requirements."  Menkes Decl. ¶ 43.  These concerns, however, have no basis, and provide no reason to amend the proposed judgment.

The judgment makes clear that defendants' successors and assigns will be bound by this agreement.  The judgment states that:

> Fyn Paint's and William Feinstein's successors and assigns (including Mr. Feinstein's Estate and his executors, solely in their capacity as Executors) shall be bound by the VCA Agreement and this Settlement Order.  Any change in ownership of Fyn Paint including, but not limited to, any transfer of assets or real or personal property, or death or incapacity of Mr. Feinstein, shall in no way alter Fyn Paint's or Feinstein's responsibilities under the VCA or this Settlement Order.

46

Proposed J. ¶ II(a)(vii).  The judgment also includes general

language to the effect that the settlement judgment will bind,

and inure to the benefit of, any successors and assigns of each

of the parties to the agreement.  Proposed J. ¶ XII(b).  These

provisions ensure that Con Edison will be able to reach

defendants, or their successors and assigns, to enforce

defendants' obligations under the VCA or any other aspects of the

agreement.

Con Edison's real concern here is that the future owner of

the Fyn Paint site will not be bound to the VCA.  But the

proposed judgment includes language to ensure that the site

purchaser will allow defendants continued access to the site to

conduct any work required under the VCA.  Proposed J. ¶ IV(b).

The proposed judgment also requires defendants to record the deed

restrictions required by the VCA, which are necessary to ensure

limited use of the site (and, accordingly, a more limited scope

of remediation work than would be necessary for unrestricted

use).  Proposed J. ¶ VII.  Defendants have also attested that

"[t]he Contract for Sale for the property . . . includes a

provision by which the purchaser acknowledges that the Deed

Restriction will be imposed on the property."  Letter from Edward

Beane to Judge Trager (Sept. 25, 2007) at 2.  These provisions

are adequate to protect Con Edison's right to enforce the

agreement, and to ensure that defendants are able to complete

work under the VCA in a timely manner, even after the sale of the Fyn Paint site.

Moreover, as Con Edison has pointed out, "defendants are obligated to investigate and cleanup the site under threat of NYSDEC enforcement under the Environmental Conservation Law, not because of anything in the settlement."  Menkes Reply Decl. ¶ 23. Although the new owner of the Fyn Paint site will not be a party to the VCA, it will be subject to DEC enforcement of the state's environmental laws.  As the court noted in finding Con Edison's whining on this score pointless as a practical matter, even if the future property owner does not assume any obligations under the VCA or settlement agreement, there should be no doubt that the property owner will be subject to DEC environmental enforcement if this site remains a threat to the public health and safety.

Con Edison appears to be raising these issues now because of its expectation that Feinstein will sell the Fyn Paint site, retire and leave the state after this agreement is finalized. But as already noted, Feinstein was over seventy-five years old at the time of the settlement, and it hardly has been a secret that he desired to retire and put this entire matter behind him. All of these facts were known by Con Edison at the time of the May 2003 agreement.  None of these facts provide any basis for concluding that defendants will not meet their obligations under

the agreement, or that the agreement will not be enforceable against defendants in the event of a future breach.

In short, defendants, or their successors and assigns, will be liable to Con Edison for any failure to comply with the terms of this agreement. Defendants, or their successors and assigns, will be reachable in the event that remediation costs exceed $4 million and the settlement is reopened. Although the future owner of the Fyn Paint site will not be a party to this settlement or the VCA, it will be subject to DEC enforcement of all applicable environmental laws in the event that remediation does not proceed in a timely fashion. Therefore, Con Edison has no basis for its claim that the judgment does not adequately bind all necessary parties to the agreement.

### e. Con Edison's Role as Voluntary Construction Manager

Con Edison's final objection is that the judgment requires Con Edison to manage the remediation work without any indemnification from defendants. Menkes Decl. ¶ 44. As an initial matter, Con Edison is wrong to claim that the May 2003 settlement did not contemplate that Con Edison would supervise the remediation process. The parties agreed that Con Edison, which had more experience with environmental cleanup work, would control the remediation process. May 7, 2003 Tr. at 8:5-9:6. In fact, the agreement to delay the signing of a final settlement

49

pending supplemental investigation was based on defendants' fears that Con Edison, as manager of the remediation process, might damage defendants' property during the course of the cleanup.

However, defendants previously conceded that Con Edison's demand for indemnification, as a condition for its managerial role, was "a legitimate issue which the Fyn Paint Defendants are prepared to resolve now in a manner consistent with Con Edison's request." Leter from Edward Beane to Judge Trager (Sept. 25, 2007) at 3. Defendants committed to "provide Con Edison with an appropriate indemnification which will exclude only Con Edison's willful conduct and preserve the Fyn Paint Defendants' rights to proceed directly against any subcontractor retained by Con Edison for that subcontractor's negligence or gross negligence in the performance of the remediation."

Defendants' proposed judgment cites the "voluntary" nature of Con Edison's supervisory role, and explains that "Con Edison shall not assume any responsibility under the VCA, including the obligation to discharge the VCA or be deemed a party to the VCA." Proposed J. ¶ II(a)(i). The proposed judgment also includes language, in a section governing "Access to Con Edison's Site," stating that defendants "shall defend, indemnify and hold harmless Con Edison against Claims of any kind by any Person arising out of or in connection with the Remediation Work, except for Claims resulting from the gross negligence or willful

misconduct of Con Edison." Proposed J. ¶ IV(a). This language appears to reflect an effort by defendants to address Con Edison's demand for indemnification.

To assuage Con Edison's concerns, which defendants have stated are reasonable, similar language will be added to the end of paragraph II(a)(i) of the judgment to make clear that this indemnity provision also applies to Con Edison's voluntary role as the manager of this remediation project. This new provision states:

> The Remediating Defendants shall defend, indemnify and hold harmless Con Edison against Claims of any kind by any Person arising out of or in connection with its voluntary functions as the supervisor of the remediation work, except for Claims resulting from the gross negligence or willful misconduct of Con Edison. The Remediating Defendants reserve the right to proceed directly against any subcontractor retained by Con Edison for that subcontractor's negligence or gross negligence in the performance of the remediation work.

### Conclusion

The environmental cleanup required by this litigation has suffered from the inability of the parties to agree upon a final stipulation to implement their May 2003 settlement agreement. It is in the best interest of the parties, not to mention the public health and welfare, to resolve this matter through the entry of a settlement judgment.

For the reasons explained above, the parties' May 2003 settlement agreement remains enforceable. The proposed judgment will be entered, with the amendments discussed above, in order to

51

implement and enforce that agreement.


Dated:  Brooklyn, New York
        March 28, 2008

                              SO ORDERED:


                              _____/s/_____
                              David G. Trager
                              United States District Judge